The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Peter C. Kavanaugh presiding. Good morning, we will 1st call. 4-23-1064 Peggy Maas Appellee versus the Board of Education District 150. If counsel for the appellant would please state your full name for the record. Good morning, Judge. This is Frazier Satterly for the defendant appellant. Thank you. And for appellee? Julie Galassi for Peggy Maas. Thank you. Parties may proceed. Thank you. Good morning and may it please the court. My name is Frazier Satterly and I represent the defendant appellant, the Board of Education of Peoria Public Schools District 150. Now this case may ring a bell for some of you. We were previously before Judges Harris, DeArmond and Kinect in case number 4-22-0773. We are back here today, your honors, following this court's dismissal of the district's initial appeal for lack of jurisdiction. Admittedly, there was a jumping of the gun. An appeal was filed after the entry of summary judgment, but prior to the trial court's entry of final judgment on damages and fees. So now the final judgment order in hand, directing the district to pay $157,000 in damages, statutory interest and attorney's fees and cost to the plaintiffs due to the plaintiffs rather Peggy Maas's own failure to properly enroll and notify the district of her enrollment in the trip program. Fundamentally, your honors, the facts and the analysis of the issues in this case have not changed since the last time we were here in March of 2023 or even since the entry of summary judgment on July 29th of 2022. Plaintiff's lack of diligence remains and she is receiving a windfall due to her own negligence. This entire controversy is about notice. When did the district have noticed that plaintiff had enrolled in the teacher's retirement insurance program known as TRIP? The undisputed answer is not until October 2017, seven years after her retirement in June of 2010, when she contacted the district for the very first time inquiring about the payments of these premiums. There are two key components of this case. You've seen it in our briefs, you're going to hear a lot about it, but the first is the language of the party's collective bargaining agreement. The second is the form provided to retirees by TRS that must be completed to enroll in TRIP and that must be returned, and this is important, must be returned to the district for completion to notify the district that the entire retiree has enrolled in the program and that the district should be billed by TRS directly for those premiums. This form, your honors, is referred to throughout our pleadings as the CMS form. In our briefs, it's available in the appendix as pages A221 through 222. In the previous appeal, this was A170 through 171. So the language of the CBA provides that eligible retirees qualify for the retirement insurance program, and it says, except as noted below, retirees may not participate in the district's plan, but may enroll in the teacher's retirement health plan, TRIP. For those employees enrolled in TRIP, the board will pay towards insurance coverage the lesser of the amount paid on behalf of the active employees or the actual amount of the TRIP individual premium, and that language is critical. It's critical now. It was critical then, but may enroll. It denotes a choice. It's not automatic. It is voluntary. This means that the language itself implicitly requires notice. In other words, there must be some way for the plaintiff to notify the district that she is exercising this option, and plaintiff has conceded that the form is that notice requirement, both at the trial court and previously on appeal. Ms. Satterley, let me ask you then, what was the deadline then for a plaintiff and other teachers similarly situated to notify the district? Thank you, Judge Harris. You've gotten right to the heart of the question, so I'll skip right to it. The thrust of the plaintiff's entire argument is that neither the form nor the CBA include an express time limitation or deadline for the form's submission. This court itself had questions regarding that issue in our last go-round back in March of 2023, and I want to be clear. There is no express time limitation or term in the form or the contract that provides that the failure to turn in the form will result in a waiver of the benefit, so in theory, under your question, an employee could retire from the district and get coverage for a time, either on a spouse's plan or via a new employer. Then, before becoming Medicare eligible at the age of 65, which is actually the cutoff, that retiree could come back to the district and indicate that they wish to take advantage of the benefit available to them under the CBA. Under that scenario, the employee would be required to complete the form, just as Peggy Moss was but failed to do, to provide the form, provide it to the district for completion of Section 8, and TRS would bill the district directly going forward, and that's important. That's not what Peggy Moss sought to do here. She came back to the district and said, well, I'm entitled to this, even though she failed to properly complete the form, and amidst that, says, I want to go back retroactively and recover all the premiums in one lump sum after belatedly realizing, due to her own failure, to either look at her statement or read the contract or do what she was supposed to do with respect to the form and take the proper steps to secure the benefit in the first place. So, according to the TRIP form, she was entitled to these benefits, and there were, I guess, what, eight sections that needed to be billed out, and she completed seven of them but didn't forward the CMS enrollment form for completion. Is that right? That's correct, Your Honor. Okay, and is it your argument that here it was an implied term of the CBA that she complete that CMS enrollment form in a timely manner? Yes, and I also think it's a very clear term of the form itself. TRS, the Teachers Retirement System, administers the TRIP program, not the district, and TRS, as you know, is not a party to the collective bargaining agreement between the Board of Education and the Peoria Federation of Teachers. The form itself that is generated by TRS indicates the very situation that confronts the court here, which is, if the school district is paying your portion of the monthly premium, the district representative must complete the appropriate information and sign the appropriate line. The district's representative must also identify the district name in TRS code. So, yes, while it was not an express term of the contract, it is the understanding in an implied term that in order to properly enroll, this form has to be filled out. Now, Ms. Moss did enroll. The issue is that she didn't complete Section 8 and return it to the district so that TRS could bill the district for her premiums, but that is an express term of this particular form. Ms. Satterley, can I ask a question? Yes. Section 8 doesn't tell her, doesn't tell anybody that they have to take this form to the district and have the district fill out this particular section of this form. It just says the district representative must complete the appropriate information and sign the appropriate line. There's nothing more for her to fill out in Section 8, is there? No, Judge, there is not. There is a provision underneath, if I may, that the district name TRS code, which the plaintiff or any retiring employee would not be privy to, has to be completed. In addition, and what the unrebutted testimony from our Director of Employee Services was, as well as the testimony of Lisa Uphoff, who was the PFT, I'm sorry, the IFT field rep at the time, was that the district would hold meetings for the retirees where TRS representative would come in and provide the packet, this document was included, and indicate what had to be done in order for them to enroll. So, while there is no express term, Judge DeArmond, as to what you're saying, right, that she was required to take this back, I think it's implicit in the language itself and what is actually required here. Is there anything in writing that is in the record that was submitted during any of these meetings that tells the retiree or the soon-to-be retiree you must take this form to the district representative and have them complete Section 8 before you mail it in to TRS? There was nothing in writing, Judge. There was the meeting which Ms. Moss conceded that she did attend, and at those meetings, the district does indicate to the employees, we need these forms back. The TRS representative further provides that information, that if your district is paying for these, which Peoria did and was providing its retirees with a unique benefit, then this form was required in order for TRS to directly bill the district. And in fact, Judge, I'm going to interrupt you just for a moment. Was that orally communicated to those in attendance at the meeting plaintiff says she was at? Yes. Okay, that's in the record? Well, it's, I mean, we don't have testimony from the TRS representative, but there is testimony that the meeting was held, that Ms. Moss attended, and that it is the district's practice to notify the employees which forms they have to turn in. Okay, and I interrupted you, sorry. So, I believe we were talking about the form and then what was required. Is there anything in the contract or the form, I'm sorry, but is there anything in the contract or the form that says, if you fail to return this form to the district, you are forfeiting any payments you might otherwise receive? No, Judge, there's no. There's no timeliness. No, there's no forfeiture language. I think it bears noting, however, that for seven years, Ms. Moss was paying these benefits out of her retirement annuity, and she received that number, she received that annuity monthly. She received TRS statements annually. Those statements are in the record. They do indicate that the premium is being deducted from her retirement annuity, and she would have seen a large chunk of which is deducted from her annuity, excuse me, and would have been deducted from her annuity on a monthly basis, and this suggests to me, again, a complete lackadaisical approach by Ms. Moss in either not understanding how much annuity she was actually owed or failing to recognize that the premium was coming out of that annuity. Well, either way, is there anything that is in writing to her telling her it's her obligation to get this Section 8 completed before she sends in the form to TRS? No, nothing but what is already in the form, Judge. Okay. So, in what you've just argued, are you transitioning now into the latches argument and your failure to act sooner? Yes, I can transition now to the latches argument. I don't mean to interject my question to your flow, but my concern with your previous argument is that her lack of discovering for whatever, if this payment or this annuity was coming out, I was going to ask you to talk about the equity of the situation when there's no language saying that there'd be a failure for not handing over the CMS form. Sure. So, just the equity of the situation is essentially what I'm asking about. I'm sorry, Judge. I didn't catch that last part. The equity of the situation where there's no express written provision saying it must be turned over at a certain time to Section 8 or whatever it is, and then this delay in discovery of the issue. Sure. Again, so I want to point to the plain language of the form, which again says, if the district is doing this, it must complete this and return it to TRS. And that's the practice, and that's what was told to the retirees. Again, I don't have anything in writing, but it's the district position that a policy or practice doesn't necessarily have to be in writing in order for it to be the actual practice and to be considered a practice in order for her to do that. Now, if we're going to talk about the equity of the situation, it's the district's position that is inequitable at this point for Ms. Moss who have come forward seven years later, regardless of what the form says, knowing that this was being deducted, or at the very least, failing to even look to see that it was being deducted, right? She was receiving, I want to be clear, she was receiving coverage. The district wasn't paying for it because she had not notified the district that she had enrolled, so thus TRS did not bill the district. But when we talk about the equities of this situation, she understood this and at some point realized that it was in 2017 and she only had approximately four months left before she became Medicare eligible. And now she's saying, look, I didn't read the contract. I didn't read the emails. I didn't look at my TRS statements. I didn't pay attention to what my retirement annuity was. And hey, district, I'm here now. And because you didn't properly tell me, you didn't hold my hand through this process, I'm entitled to this. But the problem with that and the prejudice is now we're going back not only to 2010, when in theory she should have first realized this because a significant amount was coming out of her annuity. But here we are with the court's order imposing approximately $41,000 in statutory fees for her own failure to properly fill out the form. But that's been avoided. If Ms. Hammer, the plaintiff made the request for the reimbursement of the insurance premiums at that point, if the district had said, OK, there wouldn't have been a suit, there wouldn't be statutory interest fees and costs added on, right? I mean, that's true. Had she come forward and said, I'm demanding $18,000 now. Well, didn't she? She did. And we looked into the situation. So she did do that and that would have avoided all of these things that you say constitute prejudice to the district. Isn't that true? Yes. Had the district paid the $18,000 when she came forward in theory, in theory, Judge, she would have not sued us for the statutory damages, though that is somewhat speculative. I think she still could have claimed that she was entitled to this because it was outstanding for seven years. Well, we don't know that because the district didn't pay in response to her request. And here we are. So another question then is how is it that the district was prejudiced when you acknowledge she was entitled to the reimbursement of premiums? Had this form been provided at the outset, at the outset, years prior, the district would have been paying these premiums. And instead, over the years, plaintiff was paying those premiums. Uh, all that has happened here, if plaintiff gets, you know, what she's wanting at the time pre-suit, she makes this request of Ms. Hammer, is getting reimbursed those premiums. So how is that prejudicial to the district? Well, I think there are a couple of different things here. I guess as an initial matter to that particular argument, the issue is that she didn't come forward earlier. She should have recognized that this was a problem. Now, and this is another thing I don't know under any, under any contract or any interpretation where someone can say, I failed to do what I was supposed to do. And now I'm going to come back and seek to recoup this all at once. I think that causes a problem for the district, right? When they are trying to assess their liabilities and budget for these types of things going forward. How many employees do we have that are taking advantage of this program and how do we need to account for that moving forward in our budgeting process? I think that's prejudicial. I'm also unaware, Judge, of any situation where someone can do that, where they acknowledge that this was an inadvertent oversight or they failed to do what they were supposed to do and come back and recoup retroactively. The district, when she made that demand, says, we'll pay this going forward, but you did not do what you were supposed to do. TRS indicated that you would not even authorize us to communicate with them. You did that now and we will pay it going forward. So we believe that is the prejudice, Judge. Is there anything in the contract that says that that's the only circumstance under which the district will be responsible for these payments? If they properly fill out the form? Right. No, the contract does not reference the form. Because the form, again, is... Defendant will pay toward insurance coverage, the lesser of the amount, etc. Just blanket statement. If you enroll, we will pay. That's correct. But again, TRS, who is not a party to the CBA, is the entity administering TRIP, which means that they have their own rules and procedures for billing the district for these amounts, which is the form. And I understand that completely. I think my point of my question is, though, that since you obligated yourselves to make these payments if they enroll, the burden isn't on the retiree. The burden is on you to impose whatever mechanism is necessary to make sure that this information gets conveyed to you. Instead, what you did was provided a rather vague statement in Section 8 that doesn't even tell them they have to do it on this form. It just says the district must complete the appropriate information and sign the appropriate line. But it doesn't even say, you know, this form must be taken to the district representative to be completed before one sentence. Bold letters. This form must be taken to your district representative for completion before you send it to TRS. That's it. That's all you need. That's true. But, Your Honor, when I read this and I say the district representative must complete the appropriate information and sign the line, and she has submitted this without that signature, I don't know what the expectation is at that point for a plaintiff who, by that plain language, needs to have the district complete that in order for them to be billed. And, again, this goes to notice. I'm sorry. I'm sorry. Go ahead. The district was not on notice that she'd enrolled. And that's really the problem. And I believe that's why it comes down to notice. We would not have had and we did not have any notice that she'd actually enrolled, thus obligating us to pay those amounts. This is an internal procedure and it does not necessarily need to be codified in the CBA in order for TRS as the administering entity to require that. But what imposes the burden on her to be knowledgeable of the internal processes between the district and TRS for how this actually gets done? All she's obligated to do is fill out the form. There's nothing on Section 8 that tells her you have to do X, Y, Z to get this information for all she knows. She sends it to TRS and TRS then communicates with the district and they then give them the information to complete Paragraph 8. She doesn't know what the internal mechanics of this process is. How many times do you see a form, for example, that says there's a there's a part for you to fill out and then there's a line and it says for office use only and then you send that form in and they do whatever they do with that form to complete the rest of it. That's a pretty common experience. I agree with you, Judge, and I think that this form encompasses that because it says that the district representative must complete the appropriate information. I think that's signaling to her this form must be completed by the district and it asks for the district name and TRS code and the district's representative signature. I understand it saying, Ms. Moss, you don't need to sign this, but I think it's implicit in the language that if your school is going to pay this, they must complete this and they must know that you actually enrolled. Again, without receiving this form, they had no idea that she'd enrolled and thus obligated them to pay the premiums. Thank you. Thank you, Judge. What Mr. Harman has made in his questioning is that shouldn't it be more than implicit for the one applying to figure out what to do? We would expect it to be in writing in this type of scenario. It places the burden where the burden shouldn't be as he previously indicated. Well, and I'd like to talk just very briefly on that point and I understand the point that both your honors are trying to make. And previously, we were asked, has this happened before? And the answer was no, which I think underscores the fact that most people went to the meeting and understood and listened to what the district was saying via emails that came out in April of 2010, via the meeting that was held, listening to the TRS representative when they the retirement packet and said, this is what you're required to do in order to get this ball rolling. And from an equity standpoint, in a district that has almost 13,000 students and 1500 employees, approximately 800 of which are certified, the idea that the employer can hold the employee's hand and kind of lead them to water is difficult for us to swallow. And I do think that that is the question of equity here. At what point was Ms. Moss responsible for her own financials when she was provided this information and her acknowledgement did not read it and failed to take a look at her statements after the fact. Very good. Thank you. Our questions have taken us well over time. Thank you for that. You have time and rebuttal. Councilor Galassi for the appellee. Thank you. May it please the court and council. Council has asserted midway through the argument, her latches argument. And I think it's worth looking at what the affirmative defense of latches must show. And first, it's that Moss had knowledge of a right but failed to timely assert it. Two, the delay caused a change in conditions that caused defendant to pursue a course of action different than otherwise would have taken. And if the defendant is not injured by the delay, plaintiff is not guilty of latches. The district focuses on the prejudice aspect because she waited too long. But as we sit here today, the district has yet to say, well, if she had come in after 90 days, 120 days, after one year, that they would have honored the contract and paid her any retroactive benefits. The defendant took the position in 2017 that it had no obligation to reimburse Peggy Moss. So the lawsuit was the only route she had to recover the premiums. So as of 2017, before suit was filed, the amount in controversy was $18,000. The amount didn't change. The district was on the hook to pay that $18,000. If the form had been turned in first to the district and then to TRS, and $18,000 was owed, it's the same amount in 2017. So there's no evidence that the district somehow changed their position to their detriment. And again, as I think the judge noted, the district chose not to reimburse her the $18,000. And they have never argued that they were not subject to the statute and the statutory penalties. So they went into this contesting their obligation with eyes wide open. A couple of things with regard to the prejudice. Somehow the district wants to say that they are being prejudiced because she didn't do this, she didn't do Y. The form doesn't say that the form can be turned over to TRS and then it gets turned over to the district. 1-7 says you've got to complete 1-7, sign it, and turn it into TRS, which is exactly what she did. Upon learning that from a friend in October of 2017 that the district hadn't been paying her premiums, she made a request for reimbursement and it was denied. Again, there was never any indication as to when she would have been timely or when this past practice that counsel asserts would have kicked in to allow payment. Mr. Galassi, let me ask you a question. I think her argument counsel indicated that it's the district's position that there was an implied deadline for the submission of the CMS enrollment form. It was an implied term of the CBA. What if the forms that were handed out at the meeting had an actual deadline on it? If the retiring teacher was to be submitted within a certain period of time, 60 days, say, and if it was not submitted, then that would result in a waiver of the reimbursement of benefit. Would that have run afoul of the CBA then? Would that be the district adding unilaterally a term to the CBA? Could it do that? I think so. I mean, the scenario you're proposing would have made the district's argument stronger. In her brief, counsel argued that this past practice was an implied term, but cited no authority for it that somehow past practice could override the terms of the CBA. As you'll note, the CBA has absolutely no deadlines, no notification requirements, or any provisions for waiver. That would be a closer question. My question is a little bit different. Would it have run afoul of the CBA for the district to put in a deadline, a written deadline? I believe that if there was a provision that there would be a complete forfeiture, I feel comfortable saying that would run afoul of the CBA. So if it couldn't be an express term unilaterally added by the district, could it be an implied term? That there should be a forfeiture in the event it's... I don't believe so, and I don't believe there's any case authority that I have found, nor did the district cite in support of that position. Okay, thank you. So I was discussing the fact that there is no prejudice shown. The cases cited by plaintiff or by the district go to issues of employment where a public entity has hired some other person or they have promoted some other individual, and so they are having to double pay employees. And in that case, there is prejudice shown. We don't have any such situation here. It isn't as if there was some lottery given, well, here's this $18,000 that Ms. Maas didn't collect, so we're going to give it to the other retirees. That is not the case. The only other comment on the idea that the lawsuit is the prejudice itself because of the penalties that it have attached, I think is to hold that the district is prejudiced because it must be subject to the provisions of the statute goes against the clear language of the statute and the legislative intent. When the legislature expanded the Illinois Wage Payment and Collection Act to government employees, it was to add protections to government workers and to afford government employees the same rights as private sector employees, and that includes this recovery of wages along with certain penalties and interest and attorney's fees. So, for them to say that this is some type of windfall, I think goes against the language of the statute, and the impact would be that any employer could come along and say, well, I'm being prejudiced because you filed suit, and I don't have the money, or it's going to cause a hardship, or give any number of reasons as to why they should not have to be subject to the penalties. And there's just not any authority that the district was prejudiced by application of the statute. Again, one point where counsel argued about, you know, Ms. Ma's failures, that she failed to do what she was supposed to do. If you look at the record, all of the witnesses that gave testimony regarding what the practices were with regard to these meetings are all post-Ma's, after she retired. The only thing that is in the record with regard to communications to Ms. Ma's is that there's an email saying there's going to be an informational meeting, and two, that there was misinformation given at the one meeting she did attend. There was no testimony that she was given a deadline, or anybody else in the room was given a deadline, as to when they had to turn the forum in. There was no evidence that the, you know, future retirees were told that you must turn in the form first to the district before it gets sent to TRS. You know, and again, it's somewhat confusing. To me, logically, you would sit and, if it says one through seven, complete this, send to TRS, that makes more sense that TRS would contact the district rather than you fill out all of the sections, and then you have to go to the district, have them fill it out, and then take it and send it in. And again, there's no explanation of what process anybody was supposed to follow. The district argues, if Ma's had come forward earlier, it would have addressed the issue, and there's simply no evidence of that, since they denied her request for reimbursement before her suit was filed, and they never have, as of today, said when they would have honored her request for reimbursement. Or they've never indicated when they might have adhered to a request. So again, this idea that there's some type of past practice, I think, is illusory. The other thing that council brought up is that somehow this, if Ma's is allowed to collect the $18,000 and the statutory amounts set forth in the act, that that's a windfall, and it's going to encourage cheaters, that somehow we're going to have a bunch of retired teachers sign up for TRIP and then be covered under somebody else's plan, and then, ah-ha, wait eight years before, you know, making a claim in order to collect the penalties. First off, we have evidence in the record that that hasn't happened, and I think we've got a record now that spans from 2006 to 2023, so there's not some gang of seniors concocting plans to rip off the district. And in any event, the scenario that she raises that a retiree might stay on a husband's plan or a wife's plan and then sign up for TRS, that would be a situation where I believe that the district would have a defense of, you know, of unjust enrichment if, in fact, somebody pulled such a stunt such as that. Thank you. Okay, the bottle. You're on mute, ma'am. Thank you. I apologize. The hazards of Zoom. I want to address a couple of the points made by Attorney Galassi. So she talks about witness testimony, about what happened at the retirement meetings were largely post-Moss. But again, I want to reiterate for the court, and the record is clear on this point, that there was an email that went out in April of 2010 notifying the retirees that a meeting with a TRS representative was going to happen, and Ms. Moss admitted that she did, in fact, attend that meeting. But more specifically with this whole idea of when would we have fixed the issue. So there was testimony from the Director of Employee Services, Jerry Hammer, saying, look, there is essentially a 90-day grace period. They have had situations in the past where an employee has come to them after receiving their annuity, seeing that a huge chunk of money was missing out of it for trip premiums, going to the district and saying, what is this? And they're saying, and the district would go back and check and say, we don't have your trip form. You need to go fill that out, provide it to us to get the TRS, and we'll make the payment. Right? But this wasn't a 90-day grace period. This was seven years after the fact. And this idea that we're talking about a scheme encouraging cheaters, that's not the issue. It could result in a situation where someone who maybe could afford to do it comes back and sits on this and then decides, well, you know what, I do want that benefit after all, and I want to go back and get it all now. Plus, I want the statutory interest because you didn't pay me at the first time, even though you had no idea that I had enrolled in this plan or that I meant to enroll in this plan, and I want you to pay me all that going forward. Our point with that is, look, there is a practice. The practice is the form. The form requires this. Without the district having the form, we have no idea that you enrolled. So Ms. Moss was receiving coverage. I want to be clear on that. She was receiving coverage. The premiums just weren't being paid for by the district because we had no knowledge of her enrollment. And that ultimately is the problem here. This idea that had we paid the full $18,000 when she came to us in 2017, again, she could have claimed as of 2017, well, yes, you can give me the $18,000, but you owe me interest on this because you didn't start paying it when I enrolled after my retirement. And our position would be the same. Did she ask for the interest? No, I do not. I do not know, your honors, if she specifically asked for interest going back to that date, but it has now been applied by the trial court. Okay. But we do have evidence that in 2017, she asked for reimbursement of the premiums. That's a fact, right? Yes. And there's no evidence that she asked for anything beyond that, right? Correct. Okay. So what is, if you can explain why it is that you're suggesting she might also have done something else where she might also have requested interest, how, that is speculative that she might have done that in another scenario. Here, we know she did not do that. Well, I mean, my position is even if we had paid her the, it is speculative because she ultimately sued us in 2018. My position is that we could have paid, if we had paid her the $18,000 upfront in 2018, she could have still said she was entitled to this. But yes, that's not what happened here. She sued us after the fact. And again, I think the issue is if she had sued us in 2017 or 2018, after she had already turned Medicare eligible, this was based on her own negligence and failure to fill out, to properly complete the form and put the Your Honor, with that, I know I don't have much time, but I would just respectfully ask that the court view this from an equity perspective, because if you do look at this, she is now getting the $18,000 in premiums. And even if you find that she was entitled to that, even though we offered to pay it going forward and she refused, we're now looking at $41,000 in interest and close to $100,000 in attorney's fees. And again, and I cannot stress this enough, because she failed to do what she was supposed to do. And many of the folks that testified in this matter said, look, this has never happened before because people generally follow the process and they understand what this forms mean. So we respectfully ask that this court reverse the process. I can't hear you. Still can't hear me? You're okay. Okay, don't know why. Thank you both. Well argued. We'll take the matter under advisement. We now stand in recess.